The next case on our call of the docket is case number 110792, agenda number four, Department of Corrections v. Kensley-Hawkins. Counsel, you may proceed. Good morning, Your Honors. My name is David Simonton. I'm appearing pro hoc vicee for Appellant Kensley-Hawkins. May it please the Court. In this case, the Court is called to interpret and resolve an inconsistency between two statutes that apply to the same subject matter, one of which addresses the issue specifically and the other of which applies only on a general basis. The first statute at issue is what I will refer to as the compensation statute, 730 ILCS 5-3-12-5. The compensation statute specifically and expressly addresses the extent to which income that an inmate earns from prison labor can be used to pay for the cost of the inmate's incarceration. The compensation statute expressly states that the Department may take an offset of a discrete portion of the prisoner's wages to pay the prisoner's cost of incarceration. And it states that all other wages must be deposited in the inmate's account. And the compensation statute also gives the Department the discretion to determine the offset rate, which the Department, through regulation, has set at 3 percent. Now, the second statute at issue is what I will refer to as the reimbursement statute, 730 ILCS 5-3-7-6. The reimbursement statute is one of general application in that it generally entitles the Department of Corrections to seek reimbursement of assets to pay the cost of an inmate's incarceration. The reimbursement statute does not specifically refer to prison wages, nor does it address the circumstances in which prison wages can be used to pay for the cost of incarceration. If either one of these two statutes were read in isolation, in a vacuum, without reference to context, either one of them might appear to be unambiguous. But when they're read together, as they must be, and when they conflict and they create an ambiguity in the context of this case. In this case, Mr. Hawkins worked for over 20 years in prison industry as an office furniture assembler. Through his hard labor, he was able to earn and save over $11,000. It was undisputed below that that $11,000 was solely derived from his prison wages. It was also undisputed that Mr. Hawkins had already paid the 3 percent offset as he earned his income. So the $11,000 sitting in his bank account was solely derived from prison wages and was entirely in excess of the 3 percent offset that is allowed under the compensation statute. And this, of course, is a relatively unique situation. Most prisoners are not able to save up that much money over time, but it is exactly what the prison employment system is designed to encourage, to work and to save and to be responsible and forward thinking. Are these statutes ambiguous? I would say that if read in a vacuum, either one of them would not necessarily be ambiguous. However, when applied together in the facts of this case, they do create an ambiguous situation. I believe that the Stewart v. Industrial Commission case from this court is an example, and if I may, Your Honor, get to that case later, it does illustrate a situation in which read in a vacuum language from a statute might be unambiguous, but applied to certain factual circumstances creates a latent ambiguity or an absurd result that requires a more reasonable interpretation. And in this case, what happened was because Mr. Hawkins was able to save up more than $10,000, he was flagged for a reimbursement action under the department's protocols. And the department then filed an action under the reimbursement statute to collect Mr. Hawkins' savings, even though they were entirely derived from prison wages and even though the department had already taken the 3 percent offset. As a result, it's a unique situation revealing an unanticipated situation where a prisoner has assets that justify a reimbursement action, but the assets entirely represent prison wages. Is there any priority in terms of the ability to reach the funds that he has accumulated, income he's accumulated? Priority in terms of claims? Yes, of the child support. I believe that there are exemptions that apply, one of which the department has raised, the $4,000 wild card exemption, but there are other exemptions that a prisoner may be able to take advantage of. It would come before this statute is applied? To be honest, I'm not sure to what degree they would apply. In this case, of course, what has to happen to get a reimbursement action, there actually has to be an action, there has to be a judgment, and at that point there would be a civil judgment against the prisoner for the amount of the cost of incarceration. And then it would be an issue of determining to what degree the various exemptions. So you do not know whether this statute would have priority over, say, child support? I would believe that the 3% offset automatically comes out. That is applied the minute that the wages are earned. So the prisoner would lose that money right away before it was realized. Other than that 3%, is there any area that you think would cause tension between going after the money that has accumulated? Yes, I think that the prisoner would be able to claim exemptions. Once there was a judgment against him, the state would try to enforce the judgment. The prisoner could claim exemptions based on various factors. But I'm not totally familiar with the rules of the debtor law. Mr. Hamilton, you were saying that the policy behind the work and compensation is that the prisoner would be actually compensated for the work. Isn't that what you're saying? That is one of the policies. And so with regard to that, is it accurate to say that a prisoner who has truly been compensated if the wages are given to the prisoner but then completely taken away before they can be spent? He has no ability to spend it. Was that being compensated? I would agree that a prisoner is not being compensated. It's basically a shell game in which the wages are given. There's a 3% offset taken. And then in the end analysis, the state comes back and tries to take everything, the full cost of the incarceration, which in every case is going to greatly exceed the amounts that the prisoner earned through prison employment. So as a result, there isn't going to be the hard work that was put in to save that money will all be for naught. Would it be accurate to say that the Department of Corrections would have no workers if we agreed with the state? I think that it's – pardon me. Yes, I would agree. I think that if you remove the economic incentive to work, it's going to have a devastating impact on people. And it's also going to impact the degree to which prisoners not only choose to work but the degree to which they save. If inmates know that – even inmates who might choose to work, even though they know that they might be working to pay their jailer, they will not have the same incentive to save for use upon their eventual release, which was one of the motivating factors behind the sponsor of the bill that added the offset provision to the compensation statute expressly noted that we want to encourage prisoners to save money for use upon their release. Did the defendant have the ability to switch some of this money while he was sitting there? I guess they have some kind of accounts to go to the commissary to buy things. Did he have the ability to spend the money that way in the commissary? Yes. There were deductions made. He could spend the money in various ways. Even after doing this, he still ended up with the $11,000. Correct. So what it really represented was true savings. This was over more than a 20-year period working to save money, which is exactly what the system is designed to accomplish. It's designed to encourage inmates to learn a trade, to promote habits of work and responsibility. These are goals that are not simply ideas. These are expressed statutory goals that are written into the corrections code at Section 3-12-1. The legislature has specifically identified rehabilitation, these rehabilitative goals as an important fundamental purpose of the prison employment system. And also as the legislative history shows through the sponsor of the bill that added the offset clause, the offset is designed only to take a portion of what the prisoners earn so that they will still have funds available for their release so that it will facilitate their reentry into society. But in order to get to that, we would have to find that the statutes are – that there is this latent ambiguity I think you described earlier that comes because of the application of both statutes. Is that – am I correct? No, I believe that the court's fundamental duty is to determine the legislative intent. And the legislature here has expressly identified its intent, not just in the legislative history but actually in a statute. The corrections code, 730 ILCS 5-3-12-1, sets forth the goals of prison employment. And that statute immediately precedes the compensation statute. So this isn't by reference solely to external factors or legislative history. This is actually the legislature saying, this is why we have the prison employment system and this is how it's supposed to work. There's a 3 percent offset. However, I would also say that in the context of this case, when statutes read together create an ambiguity or apply to a situation in a conflicting manner,  and in this case further confirms that the legislature's intent was not to have the reimbursement statute eat up everything a prisoner earns in wages, but rather to allow the prisoner to work, to save, and to provide the incentive for the prisoner to do that and give them the means to help themselves upon their release. If the reimbursement statute is triggered by, what is it, $10,000? That's, yes, that's an internal department protocol that they've They wouldn't bother the prisoner if he saved $9,958. Under the department's protocols, no, which we believe is an arbitrary result. There's a figure that's plucked out at $10,000. It just so happened that in this case, Mr. Hawkins was unfortunate enough, I would say, To save more money. He crossed the threshold and an action was filed. Had he gone to the commissary a couple extra times, this wouldn't have been filed. That's a very arbitrary result, and it's a result that punishes, ironically, the prisoners who embody the goals of the prison employment system the most. The prisoners who are the most diligent about working and saving are the ones who will, in the end, be punished under the department's protocol. But there's nothing really to say that the department couldn't apply this rule to prisoners who earned less than $10,000, and that creates its own set of problems because the department could expand its reimbursement action to further undermine the intent of the prison employment system. There's no question, is there, that if this man had earned this money before he was incarcerated and he was diligent about keeping it saved, they could take it? If he had saved it before, if it was an asset that was preexisting, then he would be... Even if it's earned from labor? Correct. Then, in that instance, it would be taken. So it's solely because the statute allows for prison labor and to encourage prisoners to work. Correct, correct. On the outside, people obviously have numerous incentives to work. When they're incarcerated, then, they have assets built up already. There isn't the same public policy at issue, though, of encouraging prisoners to work, to develop good work habits, to learn a trade, and to save money for use upon their release. And that ultimately is the goal of the prisoner employment system. It wasn't designed to create this fund by which the state might be able, 3% at a time, to defray the cost of incarceration. That might be an incidental goal, it might be one goal, but the real fundamental purpose is to provide for rehabilitation. Does the prisoner here have control of that bank account other than the 3% or so that's being withheld? Once it gets into his account, can he direct that it be paid over to a spouse or children or child support or anything else? I believe there are department regulations in terms of what it can be used for. There's a commissary. I don't know if there's limitations in terms of whether it's totally unfettered, but there is an ability to spend the money. I believe there's an ability to provide support for others, family members and the like. Can he direct that it be paid to a spouse, for example? Well, perhaps previously, now the department has a judgment against him, so currently he would not be able to do that. But in the past, and presumably had he known about the internal protocol of $10,000 that was not published, maybe that would be something that he would have done simply to get below the threshold. He could spend it down to avoid the situation. Correct, although that is not something the department advertises in terms of what the protocol is. And it also creates a very arbitrary system in which prisoners are essentially not encouraged to work and save as much as you can, but essentially to game the system. Well, do I have over $10,000? Do I need to spend money now on this or that or the other thing to make sure I don't cross this threshold or that threshold? Is the threshold going to change? And really, with an internal protocol, there's nothing requiring the department to enforce that. The statute itself doesn't say, the reimbursement statute doesn't say,  Sir, did I read that there is a judgment against him in the amount of $455,203.14? That is correct. So when he is released or was released, whatever work he does on the outside is going to go towards payment of that judgment, so that would be an incentive not to work on the outside. This is contrary to the policy. Correct, Your Honor. Of learning a skill inside. Yes, it is actually going to be a continuing problem. Not only in terms of his inability affecting his future income, but also his ability to get a job, to get an apartment. He's going to have a $455,000 judgment over his head. When the state knew at the time that it prosecuted this action that he only had $11,000 in assets, and later it was determined that that entire $11,000 was solely derived from his prison wages, which our contention is that those wages cannot be used at all to pay for the cost of incarceration beyond the 3% offset. So it's a case where there's $11,000 at stake, and we contend that even that $11,000 shouldn't be reached. But even if it could, it simply does not support or provide any justification for a $455,000 judgment, which the prisoner will in no way be able to satisfy, and will constitute a future burden on his attempt to reintegrate into society. And in addition to public policy concerns, there are also rules of construction, just normal rules of construction that support Mr. Hawkins's interpretation of the two statutes. For example, it's well established that a specific statute controls over a more general statute, and there is also a rule called, pardon me, adjucitum generis, which that rule holds that when a statute specifically identifies certain categories of things, and then uses the word other, that the word other should be interpreted to read back to those specific categories. And so in this case, the department is relying on section E3 of the reimbursement statute, which enumerates certain categories of income, such as workers' compensation, pension benefits, social security benefits, and then says income from any other source. Under the rule of adjucitum generis, the other should be read as referring to those specific categories, and not to prison wages, which are not identified in the reimbursement statute, and are in fact specifically addressed under a different statute of specific application, namely the compensation statute. And under that statute, the department is limited to 3% of the amount that is earned, and reading that statute as controlling would be consistent not only with the rules of construction, but more importantly with the legislative intent behind not only the compensation statute, but also the entire system of prison employment. And as in the Stewart v. Industrial Commission case, this court should look to the, should realize that the way that the statutes apply in the context of this case creates an ambiguity, that there's a conflict, and that the result, as in Stewart, would be an absurd result. And that was really what motivated the Stewart court, even though the court acknowledged that the plain language of the statute dictated one result, and even though the court acknowledged that there was no express exception contained in the statute, the court nevertheless held that because they were applying the language as written would lead to a, what it called a, quote, absurd result. But that in and of itself could create what the court called a latent ambiguity, and the court could assume that the legislature simply neglected to consider the impact of the language that it used in the particular facts before it. And that is a direct analogy to this case, where the language of the statutes were, actually we have two statutes in this case, which conflict, create an ambiguous result, something that perhaps the legislature didn't consider in the way that the two statutes would intersect and affect a person in a unique status such as Mr. Hawkins. But in any event, applying the language in the manner that the department advocates would create an absurd result. It would undermine prison employment, the prison employment system. It would effectively read out the compensation statute as a meaningful statute. It would create perverse incentives that the court should, therefore, interpret the statutes in the manner that Mr. Hawkins proposes. Thank you. Thank you, Counsel. Mr. Turner. Thank you, Your Honors. Counsel, may it please the court, I am the Illinois Assistant Attorney General, Christopher Turner, here on behalf of the appellee, the Department of Corrections. This court should affirm the appellate court's opinion, affirming the judgment in favor of the department, and holding that the department can recover Mr. Hawkins' incarceration costs from his bank account under the reimbursement statute, Unified Code of Corrections 376, because that code section expressly provides that the court, that the department can recover such costs. Excuse me, Counsel. I know I stated your name, but technically you should state your name for the record. I'm sorry, Your Honor. Christopher Turner. Thank you. Because that code section, the reimbursement statute, explicitly authorizes the department to recover such costs from any property belonging to Mr. Hawkins of, quote, whatever character, and also including, quote, from any income from any other source whatsoever. May I ask just one fast question? The judgment in this case, is it a policy that's pursued against all defendants once they're released, that I'm sorry, just to make sure I understand the question. The judgment, they pursue the judgment when they reasonably believe that there are assets there, which would satisfy some part of the judgment. Do they secure a judgment against all defendants on their release if there's still money owed to the state? No, Your Honor. I'm sorry. No, Your Honor. They will not initiate an action unless they believe that there are some assets there that would satisfy part of that judgment. So if you look at the record below at the deposition, the department believed that they referred about 20 cases at that point a year to the Attorney General's office. Right. So they only initiated an action, as counsel explained, under an internal directive, only when they identify something over $10,000 in assets. Counselor, I'd like to flush out a little bit on the question I think first asked by Justice Burke and then by Justice Kramer as well. It seems undisputed that this defendant had $11,000 in his bank account, right? Correct. And at least we heard from opposing counsel that there's an internal policy within the DOC that does not pursue claims against a defendant that would have less than $10,000. Is that likewise correct? That's correct as well. All right. So then it also seems indisputable that if this particular defendant, and this is keeping with those prior questions, had blown $2,000 on gambling and cigarettes or whatever in the DOC, that that person would have $9,000 and wouldn't even be pursued by DOC. But as a result of having $11,000, he ends up with roughly a $456,000 judgment against him. That's likewise right? Correct. That is true. All right. So my question is, do you see any problems from a policy standpoint in regard to that set of facts? Not a hypothetical set of facts, the set of facts that are before us. And is this court to honestly believe that punishing more diligent, hardworking, and responsible inmates is really what the legislature intended? Well, Your Honor, that actually, they're not punishing his honest or diligent work. There's no absurd result here. This is consistent with the way debtor law treats Illinois debtors in general. And if you look at the reimbursement statute, plain language of that statute, the intent there is to treat this debt like other debts. They incorporate all the other limitations on collection actions under Illinois federal law. But otherwise, they broadly provide a duty on all inmates to compensate the state for the money that we, the taxpayers, pay. And the large judgment in this particular instance has to do with the amount of time that Mr. Hawkins has been incarcerated. It's been well over 20 years. And that's a burden that's been, that financial burden is on the state. Does the internal policy of going after $10,000 and greater but not $10,000 and lesser promote what I, the basis for my question? Well, no, only to the extent that debtor law does in general. The guy who's spending everything on cigarettes and gambling is never, they're never going to come after him as long as he doesn't have $10,000. Debtors in general have the wild card exemption, which he mentioned, which is incorporated by the provision I just said that standard exemptions apply. So all debtors have a $4,000 exemption right there. And that allows them to spend that money as they need it. Now, usually it's not a perverse going to be perverse. Someone's going to go out and spend it on gambling. They're going to spend it on supporting themselves, supporting their family, their dependents, their loved ones. There's a variety of all sorts of ways of spending it, which are actually, there's nothing absurd or nothing perverse about. And that is the intention of leaving a poor amount. If this prisoner had a, in light of these set of facts, if an attorney didn't give advice to this prisoner and said spend it down under $10,000, because if you spend it down under $10,000, maybe you can have some fun. They're never going to come after you. If you have $10,001, it's going to cost you $456,000. Well, I can't speak to legal malpractice, but certainly there is an incentive to use the money in some fashion. Now, most inmates are going to be using that money. If they're spending it on themselves, there's nothing, again, wrong with that. You're spending it on their life, whether it's on buying a television set or other kind of items they can get at the commissary, or spending it on their loved ones. Or if they have other obligations, there's other kinds of legal obligations as well. Justice Freeman had asked before about whether or not if they had money, for instance, for legal dependents or alimony. As counsels have noted, there are other exemptions which have to go to alimony payments and child support payments, and those would be incorporated into this. But as well, in the same administrative directive that sends the $10,000 triggering amount, also the department recognizes that people will have these obligations, and particularly for legal dependents, those go first. If to the extent that they're using the money to pay those people, that money they look at, or a restitution order or a tax bill or some other legal obligation, those will go first. Then the department goes after their money. Mr. Turner, under the compensation statute then, how does that apply? What does compensation mean if he's being reimbursed for a work product and it's taken away? I mean, is he not being compensated then? He's being compensated. But he never gets to use the money. There's no quid pro quo for him. As I said, it incorporates the wild card exemption, which gives you a $4,000 buffer at any one given moment of money. I think the Department of Corrections can always, according to their decision-making process internally, make it a $6,000 or a $4,000 level of going after somebody. I'm sorry, Your Honor, but that's mistaken. There are two different triggering events here. The wild card exemption, the $4,000 buffer, is a legal exemption under the personal property exemption statute, which is available to all debtors in Illinois for all debts. And there's a wide variety of other ones as well. For instance, there's homestead exemptions. There's retirement plans. But the wild card gives you a $4,000 buffer of assets. The Department cannot change that. They cannot get the exempt money. So the $10,000 trigger is just a higher trigger, which actually, again, like other creditors, other creditors are not going to go after on day one when somebody gets their first $50 paycheck and try to file a turnover action against them. What does it mean, then, that 3% is taken out? What is that money? That is just like a wage deduction order or a garnishment order. And that goes to for what purpose? For incarceration costs and the employment program generally in order to fund that. So the state takes money twice, not only the 3% or if they have more than $10,000? Not exactly, Your Honor. It does, in a sense, it has a directive which says offset this, affirmative mandate that says you have to offset a portion of these wages before you pay them. However, then it does come back to the later funds, which are traceable to the wages. And takes the rest of the wages. It doesn't take the rest of them. First of all, it can never take the rest of them with the $4,000 wildcard exemption. There's only going to be a cent. Yeah, the order, for instance, here would only be for $7,000. It wouldn't be for the full $11,000 bank account. Now, but more importantly than that, it's $4,000 at any given time. Just like other Illinois debtors, they have this $4,000. I'm sorry, Your Honor. He can't use that $4,000? Yes, he can. He can use that $4,000 at any time, just like other debtors who have the exemption. What they use the exemption for is to meet all of their needs or whatever else they want to do with that money. They spend that money to meet their obligations, living life, whatever they need to do on an ongoing basis. It's not a set $4,000 that's just tagged once. It's a buffer on an ongoing basis to meet your needs. You spend it down, the buffer still exists. So he's had years of use of that money, whichever use it would be. In addition to saving it, he could spend it on loved ones, spend it on himself. He's been compensated. He's had use of that money for a significant amount of time and actually only reached the high level because it's been over 20 years of saving. Counsel, taking your interpretations here on the statutes, doesn't 3-7-6 then undermine the purposes of the 3-12-5? No, Your Honor, it doesn't. Why not? Well, first of all, specifically with the offset provision. The offset provision, the purpose of that, which is, again, reflected in the Section 3-12-1, which provides purposes of the work program, the prison work program, is in order to contribute to the incarceration costs. That doesn't change. The deduction order still fulfills that same purpose here, just because they go for the money in a wage deduction and then go for accumulated assets many, many years down the line, a portion of those accumulated assets. However, in addition to that, there is no ñ while certainly having inmates save money is a positive outcome, which you can make many policy arguments for, that is not an enshrined purpose of the work program. It's in order for them to learn skills. It's in order for them to learn a sense of responsibility and to contribute to the cost of incarceration. Those are the various purposes. They still have an incentive to work. With the exemption statute, most prisoners on an ongoing basis are getting that money. They still want to work for that money, to use that money to support their loved ones. And even beyond the financial incentives, they still ñ there's incentives in order to learn a skill, in order ñ just like in vocational training programs and just like in the educational programs in prison where you don't get the same compensation, they still have an incentive to participate in those. But they don't have any incentive to save. Well, they do have an incentive to save, at least until the amount would be triggered. At that point, they don't have an incentive to save. They would want to use it. They don't really have any incentive to save other than what the law requires is an exemption because that policy could be changed tomorrow. Correct, Your Honor. Just like with other Illinois debtors, that is the case. So it's like it's good for you. You should do it because it's good for you, but no, you're not going to get much benefit out of it. And the portion ñ and any idea in the statute that you're going to accumulate some money so when you get out of the place, you're going to have some body of something to allow you to get a decent housing and, you know, set yourself up a little bit, that's gone. Well, it's not ñ again, it's not ñ you still have the ñ beyond the $4,000, just like with any other debtor and any other debt, yes, that's the problem. I mean, but that was the policy decision the General Assembly has made with the reimbursement statute. If he had inherited that money or, as Justice Point out before, if he had worked before having nothing to do with his crime, had gone out, worked hard, maybe made a good investment and had this money, that money would also be subject to the reimbursement statute. There's no question about that. However, the difference ñ the only difference here is that it was money that was earned within the prison work system. Is this judgment debt dischargeable in bankruptcy? I don't know, Your Honor, but it does ñ the same limitations of federal law and collection actions do apply. So I just don't know if that's ñ What about the requirement, even if there's no judgment, that when a prisoner leaves the department, he has this debt that's owed, is that dischargeable? After two years upon release, the department can no longer initiate an action. By law? By law. That's part of the reimbursement statute in the subsection ER. Mr. Turner, what you referred to as the $4,000 wildcard exemption or exception, I couldn't quite catch it, but that only comes into play at the time of the judgment, is that right? That's not safe harbor to get you under the $10,000 threshold? That is correct, Your Honor. As I understand the administrative directive, the department looks at whether there's over $10,000 in assets and then refers it. It doesn't try to determine which of those are exempt. You mean that's an exemption that's applied against the judgment? Correct, against the action generally. All right, and one other question to follow up on Justice Burke's question about the purpose of the 3 percent. That is to reimburse the state for their incarceration costs, is that right? Yes, that is the purpose, yes. Okay, now do all prisoners work in the system? No, this is the correctional industries work system, which that's what this provision is applying to, and that's what the offset applies to. No, Your Honor, not all prisoners work, less than half the prisoners work in that. So when the individual decides to work in that program, is there not a bargain there that I'm going to work, you're going to pay me an amount that's presumably less than the market prevailing wage rate, and you're going to pay the 3 percent, and the money you make, unlike other incarcerated persons who do not work, they're not going to be subject to future collection actions, are they? Well, they are, Your Honor, if they have assets. Regardless of how they acquire them. Regardless of how they acquire those assets, correct, Your Honor. So everyone's going to be subject to that debt if they have assets, under which then the department initiates an action against them. However, the only difference here is still there is no bargain, and to echo your question, there is no bargain here with them. The department's not making any sort of promise that they're not going to go after those assets. Well, is there a signed agreement? No, Your Honor, there's no agreement of any kind along those lines, which means there is no bargain. Now, certainly prisoners, as was reflected in the reimbursement statute in subparagraph, I think it's A or B, after the duty and after it sets out the rate, it also then requires the department provides an asset information form, and it has a duty to go out and try to investigate and find, identify these assets. And even in the statute, you give this form to the inmates, they fill it out, and then identify all their assets. This form does also, it identifies the statute and the purpose of what the statute is. It's not kept a secret. This money was in the State Bank of Lincoln, but is there anything that would prevent the prisoner in this case from directing that that money be paid out to loved ones, even all of it, or at least to get below the $10,000 threshold? No, Your Honor. I believe it contemplates that usually the internal policies of the department even contemplate that. They say that they give a preference if the inmate has legal obligations, and particularly obligations in supporting legal dependents or family. Initially, the DOC could take up to 5 percent, right? They choose to take 3? Well, actually, it's even, under the statute, it says that they're instructed to offset a portion of the wages. It was the DOC that internally said, the director said, a 3 to 5 percent range, and then after they said that, the administrative director said 3 percent. Why do they choose the 3 if their position is that they can take it all eventually, outside of the $4,000? Well, as I said, Your Honor, they can't truly ever take it all, no, Your Honor, because when you've been paid the money afterwards, at that point, you still have the exemption. Under the reimbursement statute itself, the way it incorporates Illinois debtor law, you'll have this money to use for a significant amount of time that will always be the $4,000 buffer or whatever it will end up being at that point. On the interplay of the statutes, you argue that 376 is the more specific statute, but isn't it true that Section 376 deals with assets generally, while 312.5 deals specifically with prison wages? It is true that it deals specifically, as a factor, with prison wages. However, the reimbursement statute, it deals with what is the legal question in this case. It identifies and deals with what types of assets are available in order to recover incarceration costs and uses a very extensive and inclusive definition to do that. If you look at the case that Mr. Hawkins relied upon, State v. McCush, when it was looking at the Human Rights Act as opposed against the vehicle code's mandatory retirement age, it also looked at that and said, yes, on a factual basis, whether or not that retirement age really violates the age discrimination under the Human Rights Act, you could say that it's a factual matter. That's more specific. But when you look at the legal question here about which one of these two statutes is more, it's the discrimination statute which, more specifically, is going to the legal question here, the legal issue, what is, you know, what is prohibited as a matter of discrimination. But three, you would agree, 312.5 does have reimbursement provisions contained in it, doesn't it? It has sort of a wage deduction, correct. However, I also want to point out, Your Honor, that seems Let's stay focused here. Why would we not look at 312.5 for both the statute as it encompasses prison wages, which is specifically what we're dealing with here, that has a reimbursement provision? Why would we go to a general reimbursement provision? Why wouldn't we focus solely on 312.5? Well, first, of course, you're assuming a conflict. Because, Your Honor, there is no conflict here. That reimbursement provision, the offset provision, is just an affirmative mandate directing the Department to deduct wages. It says nothing about any sort of limitation on the ability to recover later funds which are traceable to those wages. So there is, just on the face of it, there is no conflict. This is unlike an exemption statute like the personal property exemption statute or the various other statutes where General Assembly repeatedly always uses those expressed terms, either exempt, exclude, limit, and says exclusion from either a judgment, an attachment, or a collection action. But even assuming that you were to find a conflict here, both of the decisions which Hawkins relies upon, State v. McCush and Village of Caton, both of those, the primary analysis in looking at that conflict, the first thing they looked at and the primary way they resolved it was which statute was enacted later. And in this case, the statute that's enacted later at the later manifestation of the legislature's intent, Your Honor, is what is the reimbursement statute. The offset provision was added in 1989. It was not until 1995 that the reimbursement statute was then completely, it was amended and completely rewritten to have all the relevant language we have today, except to the extent that in 2002, they once again amended the statute to add the specific phrases about income coming from any source whatsoever. So the later manifestation of intent, to the extent you were to find a conflict, would be the reimbursement statute, Your Honor. My time is out, Your Honor, so just like I say, for all the reasons here and the reasons set forth in the Department's brief, we ask the Court to affirm the appellate court's judgment in favor of the Department and to hold that the Department may attach Mr. Hawkins' bank account to satisfy the judgment against him. Thank you, Your Honor. Thank you, Mr. Turner. Mr. Simington, is that correct? Simington, excuse me. To address the points that counsel raised in support of the Department of Corrections, one of the main points that the Department was relying on, somewhat ironically at this point, is the $4,000 wildcard exception. And I say ironically because the Department did not apply that exemption when it sought reimbursement from Mr. Hawkins. The complaint that was filed against him sought the full cost of his incarceration. There was no deduction for the $4,000 wildcard. In fact, initially the complaint sought, in addition, it actually sought to recover, again, the 3% that Mr. Hawkins had already deposited, had already been withdrawn from his account. Does that exemption mean an exemption from a judgment or exempt from collection? It's an exemption from collection, as I understand. So the judgment would be for the full amount, but the exemption is from collection. That is true. My point only being that the Department itself doesn't say, oh, well, we have to let the prisoners have their $4,000. The Department goes after everything. But if they took a judgment for $4,000 less, they would still have an exemption for $4,000 from collection, would they not? That is true, although the Department theoretically could explain to prisoners or allow, configure its internal policies to reflect that $4,000 exemption. And in any event, even if we acknowledge that the prisoners are going to be able to claim it, there's going to be a $4,000 exemption. In this case, Mr. Hawkins worked for over 20 years. And after 20 years of hard labor, he was able to save up $11,000. That means that under the $4,000 wildcard exemption, the state could come in and take away at least $7,000 of that. That's over a decade worth of hard work. Allowing the state to do that is not going to encourage positive attitudes towards work. It's not going to facilitate a positive work ethic. It's not going to encourage prisoners to work. Also, in many cases, prisoners may come into the system with already $4,000 in assets. They might have a car. They might have a little bit of money saved up. For those prisoners, they would have absolutely no incentive to work because they would have already met the $4,000 wildcard exemption. Anything on top of that, the state would be able to take every dime they made. It will also not encourage savings. Applying this $4,000 exemption will encourage prisoners to save, at least not very much. And to the extent they do, they will always be concerned about these arbitrary limits. Instead of worrying about how hard do I work, how much do I invest in myself, they'll be worried how much do I have. Can't save up too much or I might get hit with a reimbursement action. Also, it should just be noted that this really isn't an untouchable fund. This isn't something that's preserved in the department's regulations. This is something that prisoners have to claim for themselves. In this case, Mr. Hawkins was fortunate enough to have pro bono representation. He secured the $4,000 wildcard exemption, but that likely won't be true for all the prisoners. The state will try to take everything, and in many cases it very well might get it. Turning to some other issues that were raised by counsel, the other issue about the $4,000 exemption that we should note, too, is we're not just talking about the $7,000 that's taken away currently. We're also looking at a judgment that was imposed for over $450,000. That itself is going to have consequences down the line, separate and apart from not having the money right now. Everything that he makes in the future when he's released, his ability to get a house, his ability to secure a job, they're all going to be compromised by this judgment. Do you know if that's dischargeable in bankruptcy? I do not, unfortunately. I'm not a bankruptcy lawyer. But even with that, even if it were, getting a bankruptcy on your record isn't going to help you find a job. It's not going to help you secure an apartment. It's not going to put you in good stead when you're trying to rejoin society to get credit. And that's the whole purpose of the system, is to encourage people to have a means to reintegrate into society, to have the skills, to have the resources, to have the work ethic, to become a responsible member of society. And the department's interpretation that was adopted by the appellate court undermines that entire purpose. And that purpose, I should note that in Section 3-12-1 of the Corrections Code, it does mention the contributing to the cost of incarceration as being one of the goals of the prison employment system. I think it's notable first that the clause says contribute to, not give everything you earn to. But also, it's only one of the goals. The statute also specifically identifies promoting habits of work and responsibility and teaching inmates a new skill. Those are clearly rehabilitative goals. The state wants to take one of the goals of the prison employment system and use it to run roughshod over all the other goals of the system. We believe the more consistent route to interpret these two statutes is to say, yes, prisoners will contribute to the cost of their incarceration by virtue of the 3 percent offset. And in that regard, it should be noted that the clause in 3-12-1 that was added to say, contributing to the cost of incarceration as a goal, that was added to the statute at the same time the offset clause was added. So that's why that's in there. It's to reflect the fact that the offset clause entitles a department to get some of the cost of the incarceration, to contribute to the cost by means of the offset provision. It does not authorize the department to override all the other legislative express goals for prison employment. In terms of the offset provision, one thing that's also notable about the compensation statute is there's a section in there that states that if an inmate files a frivolous lawsuit, that the department can seek up to 50 percent of the costs from the prisoner's assets. It's telling that even in that instance, even when a prisoner files a frivolous lawsuit, even then the legislature recognizes, well, the state, you can't get all of what they earn. You can only go after half of it. And for just prisoner regular incarceration costs, the state is limited to 3 percent. Again, it's further confirmation that the legislature intended from the start that the offset that the department has set at 3 percent is the rate that prisoners have to use their wages to pay for incarceration costs. And that is an excellent point. Why is it 3 percent? If the department really believed that they were entitled to get back everything, or at least everything up to the 4,000 exemption, assuming the inmate claimed it, why wouldn't it be 25 percent? Why wouldn't it be 30 percent? Or why wouldn't it be 50 percent, which was the percentage that the department acknowledged in the compensation statute that applied in cases of frivolous lawsuits? What this reveals is the fact that the department understood from the start that it was not able to get past the 3 percent, or at least shouldn't be able to collect everything that an inmate makes. That is not an internal policy that this court needs to defer to. This is simply a litigation position that the department has taken in the context of this case when faced with the unusual facts of this case where Mr. Hawkins has earned more than $10,000 in prison wages. In terms of which statute is more specific, I think that the department is playing a little bit of a word game here. The legal issue here is to what extent can prison wages be used to pay for the cost of incarceration? That is exactly the issue that Section 3-12-5 speaks to. It talks about prison wages. It talks about cost of incarceration. And it says that you can use 3 percent of the wages to pay for incarceration. That's the issue that's presented here. The reimbursement statute applies on a general basis. It is not a specific statute. And I should note that in terms of the priority of the statutes, in terms of when they were enacted, the only thing that was added to the reimbursement statute realistically that's of note to the department is the definition of assets and that it was a technical change. It wasn't a situation where the department or where the legislature enacted an entire new statute after having passed the compensation statute. What happened after the passage of the compensation statute in 1989, and the point that the department really emphasizes, is this issue about the definition of assets. But as noted in my original argument under the doctrine of Usagem Generis, when you read that definition of assets, what it says is it lists specific categories and then says income from any other source. Under this rule of construction, when you read that, the word other should be interpreted to relate back to the specific categories. In other words, other types of income like this. Not to other types of income, not to every other type, and not specifically to prison wages, which aren't discussed in the reimbursement statute, aren't discussed in the definition of assets, although it would have been very easy for the legislature to include that. Therefore, the interpretation should be, Ms. Hawkins would urge that the court reverse the appellate court opinion below and reverse the judgment that was rendered against him. Thank you, Mr. Simonton. Case number 110792, agenda number four, Department of Corrections v.